HAZLEHURST COMPRESS & MANUF'G CO. v. BOOMER & BOSCHERT COMPRESS CO.

*(Circuit Court of Appeals, Fifth Circuit. December 7, 1891.)*

1. SALE—WARRANTY—EVIDENCE OF BREACH.

A cotton-press was sold with certain warranties, and with the proviso that, "when it has performed its work in a successful manner, half cash is to be paid." The press was set up in November, 1887, and over 700 bales were pressed that season; and in the following January the cash payment was made, the purchaser giving a certificate recommending the press as a "practical machine in every respect." In November, 1888, the purchaser wrote that two nuts on the screw had broken, and that until that break the press had been doing good work, and asked an extension of time on the deferred payments, because of the small business done that year. Subsequently the request was repeated on the same ground, and an extension was granted. Over 1,100 bales were pressed in 1887-88, and over 4,000 in 1888-89. A further payment was made in 1889. No complaint of breach of warranty was made until January, 1890. *Held,* that this was almost conclusive against a claim of such breach as a defense to a suit for the balance of the purchase money, and its effect was not overcome by the testimony of unskilled workmen and unscientific persons that the press would not work to the guarantied pressure of 800 tons, such testimony being based mainly on the fact that the bands often broke from the expansion of the bales; especially as it appeared that the bands were tied by unskilled workmen, and that the press had been strained by careless management.

2. SAME.

Evidence that two other presses of the same pattern failed to work satisfactorily was competent, but the weight thereof was much impaired by the fact that one of them was the first made of that pattern, and was inferior to the one in question, and that the weight of the bales compressed by the other was above the average weight of cotton bales.

3. SAME—CONSTRUCTION OF WARRANTY.

A warranty that a cotton-press will press "at the rate of 60 bales per hour," is not a warranty that it will press at that rate for a day of 10 hours, but only for a limited time.

Appeal from the Circuit Court of the United States for the Southern District of Mississippi.

Suit by the Boomer & Boschert Compress Company against the Hazlehurst Compress & Manufacturing Company to foreclose a mortgage to secure the balance of the purchase price of a cotton-press. Decree for complainant. Defendant appeals. Affirmed.

*R. N. Miller* and *J. S. Sexton,* for appellant.

*S. S. Calhoon,* for appellee.

Before PARDEE, Circuit Judge, and LOCKE and BRUCE, District Judges.

BRUCE, J. This suit is for the foreclosure of a chattel mortgage executed January 4, 1888, by the Hazlehurst Compress & Manufacturing Company to the Boomer & Boschert Compress Company to secure the sum of $6,000, evidenced by two promissory notes, one for $1,000, and the other for $5,000, due at 6 and 12 months from date. The first note was paid; the other is unpaid, except $600, paid January 4, 1889.

The answer of the respondent company admits the allegations of fact in the bill, but says the note and mortgage in the suit were given for the purchase of a cotton compress and machinery, which was bought from appellee under a guaranty, which respondent charges has been broken, and—

"That said press will not work to a power of 800 tons without overstraining; * * * that by reason of the insufficiency of the power of said press the bands are constantly breaking on the cotton compressed in said press, and that a large proportion of it has to be run through the press at least twice to get the bands to remain on it; that the said press cannot bear the necessary power to compress a bale of cotton so as to kill the spring in the cotton; * * * and the defendant is compelled to recompress fully one-third of all the cotton handled in order to make it meet the requirements for domestic and export shipments."

Respondent charges—

"That said press will not press domestic cotton, hand-tied, at the rate of sixty bales per hour, and that it will not press export cotton, seven or eight bands, lever-tied, at the rate of fifty bales per hour to a density of twenty-two and one-half pounds per cubic foot, shipping bulk."

Respondent charges—

"That said outfit of said press and machinery is not a complete and practical machine for compressing cotton; * * * that the guaranty of said press and machinery by complainant to this respondent has wholly failed, * * * and by reason of such failure they have been damaged much more than complainants claim to be due them in the bill of complaint; and at least in the sum of seven thousand dollars, ($7,000;) and these respondents would have insisted upon a cancellation of this contract, and upon their rights, on the failure of such guaranty, and would not have paid complainant anything on said press,—for these failures of guaranty were apparent upon the outset of its operation,—but respondents, being anxious to retain said press and machinery, and to avoid doing complainants any injustice, supposed they were due to the fact that it was operated by inexperienced hands, and thus paid their money, and continued its operation, believing and hoping that the outfit would, in the hands of experienced operators, meet the full requirements of complainant's guaranty. But after the most full and satisfactory tests respondent finds that said guaranty has wholly failed as aforesaid, and prays to be dismissed with costs."

To this answer there was filed a general replication. The guaranty which the appellant claims has not been complied with is in these words:

### "GUARANTY.

"*Power.* That the press will work to a power of 800 tons without overstraining or deterioration of any of its parts, except as to ordinary wear.

"*Capacity.* That it will press domestic cotton, hand-tied, 7 bands, at the rate of 60 bales per hour; and that it will press export cotton, seven to eight bands, lever-tied, at the rate of 50 bales per hour, to a density of 22 1-2 pounds or over per cubic foot, shipping bulk.

"*Range.* That the press will be perfectly adjustable to any sized bale within the ordinary limits of the business.

"*Safety.* That the power applied will be accurately shown by the pressure indicator, thus providing in the hands of the operator absolute security against breakage; that, when properly tied and packed, the cotton compressed by this machine will meet the requirements for export and domestic shipments; that the outfit is a complete and practical machine for compressing cotton."

The rule of law seems well settled as stated in 2 Benj. Sales, (1st Amer. Ed.) § 894, on the subject of remedies of the buyer on breach of warranty, where it is said:

"(1) He may refuse to accept the goods, and return them.   *   *   *   (2) He may accept the goods and bring a cross-action for the breach of warranty. (3) If he has not paid the price, he may plead a breach of warranty in reduction of damages in the action brought by the vendor for the price."

The compress in question was sold with express warranty by the appellee to the appellant; and the latter, after the machinery was received, set up, and operated, did not elect to rescind the contract on account of any breach of the warranty, and return the property, but retained it, and operated it; and, when sued for the unpaid purchase money, seeks now, in this suit, to recoup on an alleged breach of the warranty in the contract of sale of the press. This he may do; but he may not claim special or consequential damages. At section 898, Benjamin on Sales, says:

"Buyer may set up defective quality of warranted article in diminution of price, but not to claim special or consequential damages."

The same author states the general rule that an action for damages lies in every case of a breach of promise made by one man to another for a good and valuable consideration.

Before going into an examination of the testimony of the witnesses as to whether the alleged breach of warranty is established by the proof, we may look briefly at the case upon the acknowledged facts as they appear in the record. The sale of the compress and machinery was made on the 1st day of August, 1887, for the price of $12,000. In November of that year the press and machinery was put up under the direction of appellee, and operated by appellant; and 733 bales of cotton were compressed on it the fall of that year. On the 4th day of January, 1888, one-half the purchase money was paid in cash, and notes and mortgage given for the other half of the purchase money,—one note for $1,000 and one for $5,000,—due, respectively, in six months and one year, with interest at 7 per cent.; and on the same day the appellant company, through its president, gave the following certificate:

"HAZLEHURST, MISS., January 4th, 1888.

"This is to certify that we purchased a press from the Boomer & Boschert Compress Co., of Syracuse, N. Y., and we cheerfully recommend the same as being a practical machine for compressing cotton in every respect. We can also say that Mr. G. B. Boomer, president of said company, is a gentleman with whom it is a pleasure to do business.

"HAZLEHURST COMPRESS & MANUFACTURING CO.

"I. N. ELLIS, President."

And again, in letter of November 27, 1888, Ellis, president of appellant company, says:

"Two nuts on the screw of the press have broken. Our press, up to this break, has been doing good work, but, owing to yellow fever in the early part of the season, and short cotton crops, we have not done the business we expected. * * * Owing to these causes, we will not be able to pay you more than $2,500 on the notes we owe, and ask that you favor us and extend balance to January, 1890. I hope you will be able to accommodate us in this matter, as I feel sure you will get your money at the end of another year."

The request for extension was repeated in letter of December 24th, upon same grounds, and granted in letter of appellee of December 28th. The note for $1,000 was paid; the other remains unpaid, except as to $600 paid on January 4, 1889. It was not until January 28, 1890, in letter of that date, addressed to appellee, that the appellant gave any notice or made any claim that the guaranty in the contract of the sale of the property had not been made good, and that it claimed any thing as damages for breach of the guaranty. Now, in the face of such facts, can a court of equity do otherwise than look with some distrust upon such a defense, coming under such circumstances, and at such a time? The appellant had full opportunity to make any test of the compress it desired, and there is no suggestion of deceit or fraud on the part of appellee to prevent a test. During the season of 1887–88, 1,156 bales of cotton were compressed on the press; during the season of 1888–89, 4,031 bales were compressed on it; and, as we have already seen, in the fall of that year, and before any part of the purchase money was paid and the notes and mortgage given, there were compressed upon it 733 bales of cotton. The contract of sale between the parties seems to contemplate a test and trial, for it provides: "When the press has performed its work in a successful manner, half cash is to be paid, and the balance in two equal payments." Making the payment of half the purchase money and giving notes and mortgage for the other half is, in effect, saying that the press had performed its work in a successful manner; and, to say the least, raised a presumption, more or less weighty, that there was no counter-claim for breach of warranty. This presumption is made stronger when an extension of the time of payment of the balance due was afterwards asked by the appellant, and granted, with no notice or suggestion of any claim that the warranty of the press had not been complied with, or that the appellant had a claim for breach of warranty. This would seem little short of conclusive against the claim of the appellant here in this case; and yet the courts have not held it to be conclusive; but have allowed parties to explain and show why it is that they kept back their claim, and performed acts which, without explanation, are inconsistent with the existence of such claim. *Aultman v. Wheeler*, 49 Iowa, 647. The burden is upon appellant, not only to show by proof the alleged breach of the warranty, but also to explain its conduct in the particulars named, and show why it should not be taken to be conclusive against it.

Passing now to the terms of the guaranty, and the evidence relied on to establish its alleged breach, the first is that the press is deficient in power, and will not work to a power of 800 tons, as guarantied. There were a number of witnesses who testified for appellant upon this subject. None of them seemed to be men of scientific knowledge and experienced in mechanics; and the mere opinion of such witnesses is not entitled to great weight. It is put rather by way of argument that the power is not sufficient, and would not kill the spring in the cotton, as it is called, and the rebound would break the ties on the bale, and therefore the alleged want of power. It is not shown that this breaking of the ties was not the result of unskillfulness in the persons employed as tiers, and in the want of skill and care in the handling of the press by the manager. The evidence shows that Trotter, in charge for appellant at the beginning of the operation of the press, did not handle it carefully and skillfully, but that he ran it together with great force, and "locked the nuts," as it is called; and Cook, who operated the press as engineer and manager in 1888, speaking of the marks on the indicator, says:

"Mr. Boomer impressed upon me that the upper mark, which indicated 900 tons of pressure, was the limit of absolute safety; that you could go there a thousand times with absolute safety, but not beyond that."

Then to the question, "Did you ever run it beyond the point that he indicates as the point of safety?" he answered, "Sometimes I did, though to a very slight extent." So that this compress of 800 tons' pressure was operated at its maximum, 900 tons, and above, which must have resulted in overstrain and injury to the press. It must be borne in mind that this was a light, and comparatively a cheap, press; that it required careful and skillful handling; and it is not established by the proof that it had a fair and just trial in the hands of those whom the appellant put in charge to operate it.

The same may be said as to the adjustability of the press, and as to its capacity to compress cotton at the rate of 60 bales an hour. Appellant's proposition is that the press, to meet the guaranty, should compress cotton at the rate of 60 bales an hour for a day of 10 hours. But such is not the guaranty in terms; and, considering the circumstances in proof,—the contemplation of the parties when it was agreed to put up this compress at Hazlehurst,—it is but a reasonable construction of this part of the guaranty that, under favorable conditions, it would compress cotton at the stipulated rate for a limited period of time. And it is not established by the proof that it has not and will not do so; in fact, there has been no test of the press in this respect to this day. Much of the testimony is in relation to other presses,—one put up in Demopolis, Ala., and one in Greenville, Miss.,—and this testimony is not incompetent when it is shown that these presses were of the same make and pattern, and were operated under similar circumstances and conditions. Boomer, however, testifies that the press put up for Webb at Demopolis, and about which he (Webb) testifies, was the first press made by his company of that pattern; and was an inferior press to those put up and operated in Hazlehurst and Greenville, Miss. A number of witnesses testify about

the Greenville press, as to its want of power and capacity to compress cotton at the rate guarantied; but it is shown also that the demand at that point was for a compress that would compress cotton bales much above the average weight,—some of them running over 750 pounds in weight. Manifestly the press was not adapted to cotton bales of such size and weight, and the parties took that view of it themselves, and procured from the appellee a heavier press of 1,500 tons' pressure, better adapted to the size of the bales and the volume of business at that place. It is clear from the testimony that the parties contemplated a comparatively light-made press, and it is vain and unreasonable to expect from such a compress the service obtained from heavy presses of great power, costing two and a half times as much money. The evidence does not satisfactorily establish the alleged breach of warranty, nor does it establish the *bona fides* of the claim for breach of warranty, but leaves it to the imputation that it was an after-thought. It follows that the judgment and decree of the court below is affirmed, with costs; and it is so ordered.